CITY OF COLORADO SPRINGS, an Incorporated Municipality, Robert Isaac, Leon Young, Lisa Are, Cheryl Gillespie, John Hazelhurst, Mary Lou Makepeace, Randy Purvis, Larry Small, David White, in their official capacities only as members of the Colorado Springs City Council, Defendants–Appellants/Cross–Appellees,

v.

2354 INC., a Colorado Corporation, d/b/a Baby Dolls; Golden Que, Inc., a Colorado Corporation, d/b/a Jerry McNasty's; Fantasy Books, Inc., a Colorado Corporation; Mitchell Kelloff Theatres, Inc., a Colorado Corporation, d/b/a Ambassador Cinema; Sam Leeper, d/b/a Eighth Street Adult Book & Video Store; Modern Books of Colorado, Inc., a Colorado Corporation; Darryl Deighton, d/b/a First Amendment Bookstore, Plaintiffs–Appellees/Cross–Appellants.

No. 93SA106.

Supreme Court of Colorado,
En Banc.

May 8, 1995.

Rehearing Denied June 5, 1995.

James G. Colvin II, City Atty., City of Colorado Springs, and Kurt G. Stiegelmeier, Sr. Litigation Atty., Colorado Springs, for defendants-appellants/cross-appellees.

Arthur M. Schwartz, P.C., Arthur M. Schwartz, Bradley J. Reich and Michael W. Gross, Denver, for plaintiffs-appellees/cross-appellants.

Justice KIRSHBAUM delivered the Opinion of the Court.

The defendants-appellants/cross-appellees, the City of Colorado Springs and the members of the Colorado Springs City Council (the defendants), appeal portions of a summary judgment entered by the El Paso County District Court declaring that two provisions of Colorado Springs Ordinance No. 92–159 (the Ordinance) and a related provision of the 1980 Colorado Springs Code (the Code) are unenforceable because of facial violations of the First Amendment to the United States Constitution.[1] The plaintiffs-appellees/cross-appellants, three corporations and two individuals operating bookstores and theaters and two corporations operating liquor-licensed establishments that present various forms of partially nude dancing to their patrons (the plaintiffs), appeal other portions of the trial court's judgment declaring that numerous other provisions contained in the Ordinance are not facially unconstitutional.[2] We affirm the judgment in part and reverse in part.

1. Because the trial court declared a portion of the Ordinance to be unconstitutional, direct appeal to this court is appropriate. § 13–4–102(1)(b), 6A C.R.S. (1987).

2. Plaintiffs Fantasy Books, Inc., Mitchell Kelloff Theatres, Inc., and Modern Books of Colorado, Inc., are Colorado corporations doing business in Colorado Springs, Colorado. Plaintiff Darryl

**I**

On November 24, 1992, the Colorado Springs City Council enacted the Ordinance, effective December 17, 1992. Entitled "Colorado Springs' Sexually Oriented Business Licensing Ordinance," it established standards for licensing and regulating a broad spectrum of sexually oriented commercial ventures in Colorado Springs. In adopting the Ordinance, the City Council made the following findings: (1) "[such businesses] are frequently used for unlawful sexual activities including prostitution"; (2) "the concern over sexually transmitted diseases is a legitimate health concern of the City which demands reasonable regulation of sexually oriented businesses in order to protect the health and well-being of the citizens"; (3) "any business which has as its primary purpose the selling, renting or showing of sexually explicit materials which depict or describe specified sexual activities or specified anatomical areas may have a negative impact upon surrounding businesses and residences"; (4) "experience in Colorado Springs and other cities has shown that the location of sexually oriented businesses degrade [sic] the quality of the area of the City in which they are located and cause [sic] a blighting effect upon the City"; and (5) "the City Council desires to control these adverse effects and thereby protect the health, safety and welfare of the citizens; protect the citizens from crime; preserve the quality of life; preserve property values and the character of surrounding neighborhoods and deter the spread of urban blight...."

The purpose of the Ordinance is stated in section 8–9–101 thereof as follows:

Sexually oriented businesses are frequently used for unlawful sexual activities, including prostitution. The concern over sexually transmitted diseases is a legitimate health concern of the City which

Deighton operates the First Amendment Bookstore and plaintiff Sam Leeper operates the Eight Street Adult Book and Video Store in Colorado Springs, Colorado. Plaintiffs 2354 Inc., and Golden Que, Inc., are Colorado corporations operating liquor licensed establishments in Colorado Springs, Colorado.

demands reasonable regulation of sexually oriented businesses to protect the health and well-being of the citizens, including the patrons of sexually oriented businesses. Licensing of sexually oriented businesses is a legitimate and reasonable means of ensuring that operators of sexually oriented businesses comply with reasonable regulations and that operators do not knowingly allow their businesses to be used as places of illegal sexual activity or solicitation. There is convincing documented evidence that sexually oriented businesses, because of their nature, have a deleterious effect on both the existing businesses around them and surrounding residential areas, causing increased crime and downgrading of property values. The purpose of this Ordinance is to control adverse effects from sexually oriented businesses and thereby protect the health, safety and welfare of the citizens; protect the citizens from increased crime; preserve the quality of life; preserve the property values and character of the surrounding neighborhoods and deter the spread of urban blight.

The Ordinance defines "sexually oriented business" to mean "an adult arcade, adult bookstore, adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, sexual encounter establishment, or other similar business" that features persons appearing in a state of nudity or live performances or photographic reproductions depicting or describing "specified sexual activities or specified anatomical areas." Colorado Springs, Co., Code § 8–9–102 (1992). The Ordinance also contains the following pertinent definitions:

*SPECIFIED ANATOMICAL AREAS* are defined as:

a. Less than completely and opaquely covered: human genitals, pubic region, buttocks, and female breast below a point above the top of the areola.

b. Human male genitals in a discernibly turgid state even if completely and opaquely covered.

*SPECIFIED SEXUAL ACTIVITIES* means acts, simulated acts, exhibitions, representations, depictions or descriptions of:

a. Human genitals in a state of sexual stimulation or arousal.

b. Fondling or other erotic touching of human genitals, pubic region, buttocks or female breast.

c. Intrusion, however slight, of any object, any part of an animal's body, or any part of a person's body into the genital or anal openings of any person's body or into the body of an animal.

d. Cunnilingus, fellatio, anilingus, masturbation, bestiality, lewd exhibition of genitals or excretory function.

e. Flagellation, mutilation or torture for purposes of sexual arousal, gratification, or abuse.

Colorado Springs, Co., Code § 8–9–102 (1992).

Section 8–9–104 of the Ordinance provides that any person operating a sexually oriented business must obtain a license from the licensing officer and describes the qualifications necessary for licensure. Section 8–9–105 of the Ordinance establishes standards and time limits for approval or denial of applications for sexually oriented business licenses. Sections 8–9–106 through –108 of the Ordinance contain requirements for regulation of managers and employees of licensed businesses and authorize periodic inspection of licensed premises. Sections 8–9–109 through –111 of the Ordinance deal with the expiration, suspension, and revocation of issued licenses. Sections 8–9–112 through –121 of the Ordinance set forth minimum age provisions, hours of operation, peep booth regulations, lighting regulations, regulations particular to adult theaters and adult cabarets, regulations concerning the conduct and tipping of employees, adult motel regulations, injunctions, and fees.

In late December 1992, the plaintiffs filed this civil action against the defendants. The plaintiffs claimed, *inter alia,* that the Ordinance on its face violated federal and state constitutional guarantees of freedom of speech and requested the trial court to enter judgment to that effect and to enjoin the

enforcement thereof.[3] The plaintiffs and the defendants filed cross-motions for summary judgment, pursuant to C.R.C.P. 56.

The trial court ultimately entered a three-page judgment in effect declaring three sections of the Ordinance and one section of the Code to be facially unconstitutional and declaring that the other sections of the Ordinance did not violate constitutional principles guaranteeing freedom of expression.[4] Relying on *7250 Corporation v. Board of County Commissioners*, 799 P.2d 917 (Colo.1990), and applying the criteria developed by the United States Supreme Court in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), the trial court concluded that the City had authority to enact the Ordinance, that except for the three sections thereof determined to be unconstitutional the provisions of the Ordinance are content-neutral and restrict expression in a reasonable manner in furtherance of a legitimate governmental interest, that the Ordinance provides reasonable time limits for application and appeal processes, and that the standards established by the Ordinance for suspending or revoking licenses are constitutionally adequate.

3. The plaintiffs also alleged that the Ordinance was vague, overbroad, and violated "the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution as well as Article II, Sections 10 and 25 to the Colorado Constitution...." The trial court's judgment is based on First Amendment analysis only, as developed by this court in *7250 Corp. v. Board of County Comm'rs*, 799 P.2d 917 (Colo.1990). Although the plaintiffs' briefs on appeal refer to Colorado constitutional provisions, in view of the posture of the case, we address only the issues determined by the trial court.

The plaintiffs also sought damages and attorney fees. Questions pertaining to those issues are not before us.

4. The trial court granted the defendants' summary judgment motion in part and granted the plaintiffs' summary judgment motion only insofar as it sought a prohibition on the enforcement of "Sections 8–1–801(D), 8–9–105, and 8–9–112." Section 8–1–801(D) is not contained in the Ordinance. It is contained in the Code, and states in full as follows:

D. The licensee or any agent or employee of such licensee has violated any law of the United States, of the State of Colorado or the City of Colorado Springs when such violation occurred on the licensed premises, or relates

## II

The defendants contended at oral argument that the plaintiffs lack standing to challenge the facial validity of the Ordinance. We disagree.

Section 8–9–109 of the Ordinance provides that each license expires one year from the date of issuance and may be renewed only by initiation of a new application. This licensing scheme, like the scheme at issue in *City of Lakewood v. Plain Dealer Publishing Company*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), is "sufficiently threatening to invite judicial concern ... [because] even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit...." *Id.* at 760, 764, 108 S.Ct. at 2145, 2147 (emphasis in original); *see also Suburban Video, Inc. v. City of Delafield*, 694 F.Supp. 585, 592 n. 6 (E.D.Wis.1988). Because all of the plaintiffs are required to reapply annually for licenses, they have alleged sufficient damage to their First Amendment interests resulting from the

to conduct or activity of any business required to be licensed by this Chapter. (Ord. 75–164; Ord. 87–153; 1968 Code § 5–42; 1980 Code) Colorado Springs, Co., Code § 8–1–801(D) (1980).

In addressing the trial court's judgment, the defendants acknowledge that it in effect declares section 8–9–110(A)(3) of the Ordinance invalid, which section states in pertinent part as follows:

A. In addition to the grounds set forth for suspension or revocation of a license in Section 8–1–801 of this Chapter, the Licensing Officer shall suspend a license for a period not to exceed six (6) months and may revoke a license if the Licensing Officer determines that a licensee or an employee of a licensee has:

1. Violated or is not in compliance with any Section of this Article;

2. Refused to allow an inspection of the sexually oriented business premises as authorized by this Chapter; or

3. Knowingly permitted any unlawful act upon the premises.

Colorado Springs, Co., Code § 8–9–110(A) (1992).

The plaintiffs' complaint sought a declaration that both provisions are constitutionally invalid. We agree that the trial court implicitly found section 8–9–110(A)(3) of the Ordinance to be invalid.

adoption of the Ordinance to challenge the facial validity of the Ordinance. *See Perrine v. Municipal Court,* 5 Cal.3d 656, 97 Cal. Rptr. 320, 322 n. 5, 488 P.2d 648, 650 n. 5 (1971); *EWAP, Inc. v. City of Los Angeles,* 97 Cal.App.3d 179, 158 Cal.Rptr. 579, 582 (1979).[5]

### III

■ Section 8–9–104(A) of the Ordinance provides that "[i]t shall be unlawful for any person to operate a sexually oriented business without a license issued by the licensing officer under the provisions of this Chapter." If no license is issued to an applicant, access by the public to that applicant's contribution to the "market place of ideas," *see Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), is denied. Because no alternative means of access to those ideas are available, the licensing provisions of the Ordinance constitute a prior restraint that subjects certain communications to governmental regulation in advance of the time that such communications are to occur. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 224–26, 110 S.Ct. 596, 603–05, 107 L.Ed.2d 603 (1990) (plurality opinion). Governmental regulations that prohibit future dissemination of constitutionally protected speech constitute prior restraints. *City of Lakewood v. Colfax Unlimited Ass'n,* 634 P.2d 52 (Colo. 1981).[6]

■ Because governmental regulations establishing a system of prior restraint on constitutionally protected expression are presumed to be invalid, they must be measured by the strict scrutiny standard of review. *Plain Dealer Publishing Co.,* 486 U.S. at 757, 108 S.Ct. at 2144; *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); *New York*

*Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141–42, 29 L.Ed.2d 822 (1971); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *Kunz v. New York,* 340 U.S. 290, 293, 71 S.Ct. 312, 314–15, 95 L.Ed. 280 (1951); *Cox v. New Hampshire,* 312 U.S. 569, 574–75, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). Application of this stringent standard of review to governmentally imposed systems of prior restraint is essential to ensure the continued vitality of the premise that in this society the ability to express ideas freely and without governmental censorship is a central component of our concept of ordered liberty. *See Lovell v. Griffin,* 303 U.S. 444, 451–52, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938).

In addressing the question of whether the Ordinance constitutes a prohibited system of prior restraint, we must initially determine whether it contains adequate procedural safeguards to ensure that the licensing officer must determine whether to issue a license to an applicant within a defined period of time and that prompt judicial review of such determination is available. *FW/PBS,* 493 U.S. at 225–28, 110 S.Ct. at 604–06 (plurality opinion); *Freedman v. Maryland,* 380 U.S. 51, 58–60, 85 S.Ct. 734, 738–40, 13 L.Ed.2d 649 (1965). If such procedural safeguards are adequate, we must then determine whether there is a compelling government interest in establishing the licensing scheme and whether the criteria for issuing licenses established thereby are sufficiently narrow, objective and definite to prohibit the licensing officer from exercising unfettered discretion. *Plain Dealer Publishing Co.,* 486

---

**5.** The Ordinance arguably applies to some entities that promote obscene conduct not protected by the First Amendment or art. II, § 10, of the Colorado Constitution. However, plaintiffs' businesses engage in non-obscene sexually explicit expression, which conduct is constitutionally protected. Thus the plaintiffs have sufficient cognizable interests to pursue their constitutional challenges. *See Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982, 985 (Colo.1981)

(live, nude entertainment); *cf. Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959) (bookstores); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976) (motion picture theaters).

**6.** At oral argument the defendants conceded this characterization of the Ordinance.

U.S. at 757, 108 S.Ct. at 2144; *Marco Lounge*, 625 P.2d at 988.

## A

In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion), the Supreme Court held a Dallas, Texas, sexually oriented business licensing ordinance to be unconstitutional on its face because it lacked necessary procedural safeguards to assure an absence of unfettered governmental censorship. The Dallas scheme regulated sexually oriented businesses by means of a combination of zoning, licensing, and inspection provisions.

The plurality opinion in *FW/PBS* concluded that the Dallas ordinance was subject to analysis under the prior restraint criteria established by the Court in *Freedman*, 380 U.S. 51, 85 S.Ct. 734. *FW/PBS*, 493 U.S. at 227–30, 110 S.Ct. at 605–07 (plurality opinion). In *Freedman*, the Court held that a film censorship scheme must include three basic procedural safeguards to ensure expeditious governmental decision-making affecting freedom of expression interests: (1) any restraint prior to judicial review could only be imposed for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of the decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech as well as the burden of proof once in court. *Freedman*, 380 U.S. at 58–59, 85 S.Ct. at 738–39. The *FW/PBS* plurality determined that because the Dallas ordinance did not authorize regulation of the content of any constitutionally protected speech, only the first two of the safeguards articulated in *Freedman* need be considered. *FW/PBS*, 493 U.S. at 228–30, 110 S.Ct. at 606–07 (plurality opinion).[7] The plurality also determined that when constitutionally protected speech is regulated a specific and brief time period for administrative action and prompt judicial review is an indispensable ingredient of any licensing program establishing general qualifications for applicants. The following portion of its opinion emphasizes this principle:

> The core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

*Id.* at 228, 110 S.Ct. at 606 (citing *Freedman*, 380 U.S. at 51, 85 S.Ct. at 734–35; *Shuttlesworth*, 394 U.S. at 155 n. 4, 89 S.Ct. at 941 n. 4; *National Socialist Party of Am. v. Skokie*, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977)). Other federal courts have acknowledged this basic policy. *See, e.g., East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 224–25 (6th Cir.1995); *11126 Baltimore Blvd. Inc. v. Prince George's County, Md.*, 32 F.3d 109, 114 (4th Cir.1994); *Redner v. Dean*, 29 F.3d 1495, 1500 (11th Cir.1994); *TK's Video, Inc. v. Denton County, Tex.*, 24 F.3d 705, 707–08 (5th Cir.1994); *Graff v. City of Chicago*, 9 F.3d 1309, 1323–25 (7th Cir. 1993) (en banc); *Mga Susu, Inc. v. County of Benton*, 853 F.Supp. 1147, 1153 (D.Minn. 1994); *Bukaka, Inc. v. County of Benton*, 852 F.Supp. 807, 813 (D.Minn.1993); *Chesapeake B & M, Inc. v. Harford County, Md.*, 831 F.Supp. 1241, 1247–50 (D.Md.1993); *T.K.'s Video, Inc. v. Denton County, Tex.*, 830 F.Supp. 335, 345–47 (E.D.Tex.1993).

These principles of prior restraint analysis inform our initial review of the trial court's summary judgment.

## 1

■ Section 8–9–105(A)(5) of the Ordinance provides that a license shall be issued to an applicant otherwise satisfying specific requirements of the Ordinance within thirty

---

7. Although the Court's opinion was fragmented, six justices agreed that the first two requirements in *Freedman* were applicable. *See FW/PBS*, 493 U.S. at 229–30, 110 S.Ct. at 606–07 (plurality opinion); *see also id.* at 238–39, 110 S.Ct. at 611–12 (Brennan, J., concurring in the judgment).

days after receipt of the application unless the affected premises "have not been approved by the Fire Department, the Building Official of the Pikes Peak Regional Building Department and the Licensing Officer as being in compliance with applicable laws and ordinances." The plaintiffs note that the Dallas ordinance found unconstitutional in *FW/PBS* similarly provided that a license would be issued within thirty days of application unless one of several express conditions had not been satisfied, including the obtaining of approval from various municipal agencies. However, the Court concluded in *FW/PBS* that the Dallas ordinance impermissibly provided "no means by which an applicant may ensure that the business is inspected within the 30–day time period within which the license is purportedly to be issued if approved." *FW/PBS*, 493 U.S. at 227, 110 S.Ct. at 605 (plurality opinion). The Ordinance does define the time period within which administrative action must occur.

Section 8–9–105(C) of the Ordinance requires that requisite fire and building inspections "shall [be completed] ... within twenty (20) days of receipt of the application by the licensing officer"; that certifications by such entities "shall be promptly presented to the Licensing Officer"; and that the licensing officer's inspections "shall be completed within thirty (30) days after the receipt of the application." Thus the Ordinance expressly limits the time within which all requisite inspections must occur to the thirty-day period during which the licensing officer must act.

The plaintiffs assert that the Ordinance in effect provides no specific time period for initial administrative action because it provides no remedy in the event all inspections are not completed within the thirty-day time period established by section 8–9–105(A) or the licensing officer fails to act within that time period. The defendants assert that the Ordinance should be construed to require approval of an application if the inspections are not timely completed. That construction of the Ordinance best assures the protection of the plaintiffs' First Amendment interests and is consistent with the numerous requirements for expedited administrative action.

*See City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 64 n. 18 (Colo.1981). We therefore adopt the defendants' view and hold that an application for a license not acted upon by the licensing officer within thirty days of the receipt of the application must be deemed granted.

■ The plaintiffs also argue that the thirty-day period of time for initial administrative action established by the Ordinance is not sufficiently brief for purposes of prior restraint analysis. We disagree. The period of time is in our view reasonable in light of the overall scheme of the Ordinance. *See FW/PBS*, 493 U.S. at 229, 110 S.Ct. at 606–07 (plurality opinion).

Section 8–9–104(D) of the Ordinance provides that an application for a sexually oriented business license must be accompanied by a zoning permit and that if "such permit is subject to appeal, no further action shall be taken upon such application until such appeal is finally adjudicated." Section 8–9–105(A)(6) of the Ordinance provides in pertinent part as follows:

A. The sexually oriented business shall be issued a license within thirty (30) days after receipt of an application [that satisfies relevant requirements] ... unless the Licensing Officer finds one or more of the following:

. . . .

6. The applicant has not been issued a permit by the Zoning Administrator ... and that such permit, if issued, is not subject to appeal....

The plaintiffs argue that the period of time for obtaining a zoning permit is in reality unlimited for an unsuccessful applicant that must appeal an adverse zoning administrator decision and that therefore the period of time within which such persons or entities may obtain a sexually oriented business license is similarly unlimited. We disagree.

It must first be noted that the requirement of obtaining a zoning permit is a prerequisite condition for obtaining a sexually oriented business license. The licensing authority must act within thirty days of receiving an application. The period of time necessary to comply with prerequisites to licensing, if not

itself excessive, does not render an otherwise acceptable time period unreasonably lengthy.

We do not view the time period within which the zoning application permit process must be completed to be unreasonable. *See, e.g., Redner,* 29 F.3d at 1500 (forty-five-day period for administrator's decision to grant or deny license not unreasonable); *TK's Video,* 24 F.3d at 708 (sixty-day time period for review of licensing application for adult bookstore valid); *Chesapeake B & M,* 831 F.Supp. at 1249-50 (forty-four-day time period for review of adult bookstore licensing application not unreasonable); *Wolff v. City of Monticello,* 803 F.Supp. 1568, 1574 (D.Minn.1992) (ninety-day time period for decision on adult bookstore license application not unreasonable); *but see 11126 Baltimore Blvd.,* 32 F.3d at 116 (150–day time period for administrative decision invalid). Section 14.1–11–103(d) of the Colorado Springs Zoning Ordinance requires the zoning administrator to approve or deny a zoning permit application within ten working days of the submittal. Thus, assuming a zoning permit is granted, an applicant for a sexually oriented business license will be entitled to a decision on the application within forty days from the date that the request for a zoning permit is filed.

Section 8–9–104(D) of the Ordinance provides that in the event an applicant elects to appeal a decision of the zoning administrator, whether because the zoning permit requested is denied, because the zoning permit is deemed inadequate, or for any other reason, "no further action shall be taken upon such application until such appeal is finally adjudicated." Thus, when the applicant decides to appeal an adverse zoning administrator decision, the process of licensure is tolled by means of the applicant's decision. To conclude, as the plaintiffs do, that the voluntary choice of an applicant to appeal a zoning classification renders the licensing scheme itself unconstitutional because there is no *specified* time limit for the completion of such appeal process ignores the fact that the time limit specified by the Ordinance for final action by the licensing officer remains intact. The amount of time consumed by the process of judicial review of an adverse zoning administrator determination will also depend in large part on the conduct of the applicant.

**2**

■ The plaintiffs contend that the Ordinance is facially invalid because it does not require prompt judicial review of decisions of the licensing officer. We disagree.

Section 8–9–105(D) provides that applicants denied a license may appeal such decisions. Sections 8–1–601(B) through –601(D) of the Code establish procedures for such appeals, as follows:

B. If the Licensing Officer shall not so find he shall thereupon deny such application and notify the applicant of the denial by serving upon the applicant personally a copy of such denial and the reasons supporting such denial or by mailing the same to him by registered or certified mail at the business address shown on the application.

C. Any applicant aggrieved by any final order of the licensing officer after the denial of such application shall have the right to appeal to the City Council by filing a written appeal, stating the grounds thereof, with the City Clerk within ten (10) days following the date of denial of said application.

D. In the event an appeal is timely filed, it shall be heard at the next regular City Council meeting occurring at least ten (10) days after said filing with the City Clerk. Review by Council shall be a de novo hearing.

Section 8–1–808 of the Code contains the following provisions:

A. The decision of the City Council in all cases shall be final and conclusive and shall be served upon the licensee by personal service, by registered or certified mail, or by posting as provided in Section 8–1–804 of this Chapter.

B. A decision of City Council is reviewable only by Court under Colo.R.Civ.P. 106(a)(4). There shall be no stay of execution pending a review by the Court except by Court order.

The following portions of C.R.C.P. 106(a)(4) are also relevant to consideration of the plaintiffs' arguments:

> (a) ... In the following cases relief may be obtained in the district court....
>
> ....
>
> (4) Where any governmental body ... exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law:
>
> (I) Review shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer.
>
> ....
>
> (V) The proceedings before or decision of the body or officer may be stayed, pursuant to Rule 65 of the Colorado Rules of Civil Procedure.
>
> ....
>
> (VIII) The court may accelerate or continue any action which, in the discretion of the court, requires acceleration or continuance.[8]

The plaintiffs initially argue that the Ordinance does not authorize any judicial review process for licensing officer denial of license applications because section 8–1–808 of the Code is located in that portion of the Code dealing with suspension and revocation procedures. We reject this narrow construction of the Ordinance and the Code.

The Ordinance is designed to ensure rapid and adequate judicial review of license applications as well as license suspensions and revocations. The only provisions of the Code defining appeal procedures in the City Council are established by Part 8 thereof. Section 8–1–808(A) applies to "all" cases under the Code. Section 8–1–808(B) authorizes judicial review of every decision of the City Council. Moreover, sections 8–1–602(C) and (D) of the Code expressly establish the right of an applicant to appeal the denial of any license application to the City Council. When considered together, part 6 and part 8 of the Code provide that an unsuccessful applicant for a sexually explicit business license may appeal that determination pursuant to section 8–1–808 thereof.

The plaintiffs contend that the procedures provided by section 8–1–808 of the Code and C.R.C.P. 106(a)(4) do not withstand prior restraint analysis because they do not establish a mandatory mechanism to preserve the status quo for the shortest fixed period compatible with sound judicial resolution and do not "minimize the deterrent effect of an interim and possible erroneous denial of a license." *Freedman,* 380 U.S. at 59, 85 S.Ct. at 739. We disagree.

In *Fernandes v. Limmer,* 663 F.2d 619, 628 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982), the Fifth Circuit Court of Appeals observed that "to an unsuccessful permit applicant, the unavoidable delay posed by judicial review is tantamount to an effective denial of First Amendment rights." In *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), and in *National Socialist Party v. Village of Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977), the Supreme Court recognized that in the absence of a stay of an adverse determination, persons may be forced to abandon constitutionally protected rights to freedom of expression during the period of time necessary to complete appellate judicial review of such adverse determination. In *Conrad,* the Court held that the denial by municipal licensing authorities of a promoter's application to present scheduled performances of the musical "Hair" based on the content of the production constituted a prior restraint and that the procedures for appellate review available to the promoter were inadequate to obviate the dangers of censorship. *Conrad,* 420 U.S. at 562, 95 S.Ct. at 1249. In *Skokie,* the Court concluded that in the absence of a stay of an initial injunction prohibiting a controversial march by a political group or of an expedited review of such injunctive order,

---

8. We have recognized that parties may challenge the constitutionality of ordinances as applied in C.R.C.P. 106(a)(4) review proceedings. *Tri–State*

*Generation and Transmission Co. v. City of Thornton,* 647 P.2d 670, 676 n. 7 (Colo.1982).

the injunction constituted an impermissible prior restraint on the First Amendment rights of the group. *Skokie*, 432 U.S. at 44, 97 S.Ct. at 2206.

The availability of an expedited procedural mechanism to stay adverse administrative decisions assures that an applicant's ability to exercise constitutionally protected rights of expression are not unreasonably restrained. Such procedures preserve the status quo of the parties. *See FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606 (plurality opinion). In some circumstances an adverse administrative decision would not alter the status quo of the parties. The Ordinance distinguishes between applicants seeking new licenses and applicants appealing the suspension or revocation of previously issued licenses. In the former case, the sexually oriented enterprise will not open for business because no license will have been issued. "The status quo for a business seeking a permit to begin operating a sexually oriented business ... is non-operation. The city, therefore, does not need to allow operation pending review." *East Brooks Books*, 48 F.3d at 225; *accord TK's Video*, 24 F.3d at 708 (an applicant for a license not in business when the licensing regulations were adopted is not free to operate while its license is pending). However, if the sexually oriented business is operational, preservation of the status quo will in all probability require that the suspension or revocation be stayed pending final judicial resolution on the merits. *TK's Video*, 24 F.3d at 708 ("Maintaining the status quo means in our view that the County cannot

regulate an existing business during the licensing process.").

We conclude that C.R.C.P. 106(a)(4) provides adequate procedural safeguards. The rule authorizes district courts to enter orders staying the effect of decisions of the licensing officer and the city council. Although in some circumstances an applicant may be entitled to a judicial order staying such decisions even before filing a C.R.C.P. 106 claim, such a stay will not be required in every case. The provisions of C.R.C.P. 106(a)(4)(V) and C.R.C.P. 106(a)(4)(VIII) establish procedures for both a stay of the effect of an adverse decision and expedited review thereof.[9] Under these circumstances, we conclude that C.R.C.P. 106 and the Ordinance provide adequate safeguards to ensure that any impermissible prior restraint on a particular applicant's protected rights of free speech may be remedied promptly by judicial intervention.

We also conclude that C.R.C.P. 106(a)(4)(V) and C.R.C.P. 106(a)(4)(VIII) provide "an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial." *FW/PBS*, 493 U.S. at 229, 110 S.Ct. at 606 (plurality opinion). The provisions of C.R.C.P. 106(a)(4)(VIII) specifically authorize a district court to accelerate or continue any action, and, as indicated, C.R.C.P. 106(a)(4)(V) authorizes a district court to stay any decision to deny, suspend, or revoke a license. These provisions are adequate to withstand the plaintiffs' facial challenge to the Ordinance.[10]

---

**9.** The following provisions of C.R.C.P. 65 are relevant to this analysis:

 (a) **Preliminary Injunction.**

 (1) **Notice.** No preliminary injunction shall be issued without notice to the adverse party.

 (2) **Consolidation of Hearing with Trial on Merits.** Before or after the commencement of the hearing on an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon a trial on the merits becomes part of the record on the trial and need not be repeated upon the trial, this subsection (a)(2) shall be

so construed and applied as to save the parties any rights they may have to trial by jury. C.R.C.P. 65.

 The purpose of the preliminary injunction under C.R.C.P. 65 is to preserve the "status quo" or protect rights pending the final determination of a cause. *Combined Communications Corp. v. City & County of Denver*, 186 Colo. 443, 528 P.2d 249 (1974). While this rule provides that no restraining order or preliminary injunction shall issue without notice, except under certain situations, and that an early hearing shall be provided, no such conditions appear in C.R.C.P. 106. *PII of Colo., Inc. v. District Court*, 197 Colo. 239, 591 P.2d 1316 (1979).

**10.** The Court has not clarified what constitutes reasonably rapid judicial review. A five-month period for judicial review was determined to be inadequate to satisfy *Freedman* safeguards in

**3**

■ The plaintiffs argue that the Ordinance impermissibly fails to require the licensing authority to prove that particular material or conduct is unprotected and to initiate review proceedings in the event an application is denied or a license is suspended, revoked or not renewed. We do not agree.

The Ordinance establishes specific, objective criteria that define the basis for any decision by the licensing authority. *See* Part III B, *infra.* Thus, the licensing authority is not authorized to evaluate the content of any book, movie, production, or work of art. These circumstances are far removed from the censorship conditions underlying the *Freedman* and *Conrad* decisions upon which the plaintiffs rely. *See FW/PBS,* 493 U.S. at 228, 110 S.Ct. at 606 (plurality opinion). As we have noted in Part III A 2, *supra,* the Ordinance, in conjunction with C.R.C.P. 106(a)(4), provides any person or entity aggrieved by a decision of the licensing officer the opportunity to obtain prompt administrative and judicial review thereof and to request a stay of any administrative order that arguably constitutes a prior restraint of protected expression.

**B**

We have concluded that applicants for licenses under the Ordinance are provided with adequate administrative and judicial procedural safeguards. We must next determine whether the Ordinance serves a compelling governmental interest and, if so, whether the criteria established by the Ordinance for issuing licenses are sufficiently narrow, objective, and definite to prohibit the licensing officer from exercising unfettered discretion that may result in censorship of constitutionally protected expression. *Plain Dealer Publishing Co.,* 486 U.S. at 757, 108 S.Ct. at 2144; *Marco Lounge,* 625 P.2d at 988; *see FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. at 604–05 (plurality opinion).[11]

The principle that constitutionally protected expression, however objectionable or offensive, cannot be prohibited by governmental authority is grounded in the recognition that "[u]niversal experience has shown that such freedom [of expression] is necessary to the perpetuation of our system of government in its integrity...." *Cooper v. People ex rel. Wyatt,* 13 Colo. 337, 367, 22 P. 790, 799 (1889). As the Supreme Court observed with respect to arguably offensive political speech:

> Madison, who was the leading spirit in the preparation of the First Amendment of the Federal Constitution, thus described the practice and sentiment which led to the

*Conrad,* 420 U.S. at 562. The Court has also indicated that an appellate review process of over one year is not prompt, and in the absence of immediate appellate review, "the State must instead allow a stay." *Skokie,* 432 U.S. at 44, 97 S.Ct. at 2206. In *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 371–74, 91 S.Ct. 1400, 1405–07, 28 L.Ed.2d 822 (1971), the Court construed a federal statute imposing a prior restraint to require that judicial review be sought within 14 days and concluded that delays of between 40 days and six months could not be sanctioned. The Eleventh Circuit Court of Appeals has stated that the Court has "implied that a state's statutory or common-law mechanisms for review of administrative decisions [do] not satisfy the procedural requirements of *Freedman.*" *Redner,* 29 F.3d at 1501 n. 9. Other circuit courts of appeal follow this track in interpreting the *Freedman* prompt judicial review requirement. *See East Brooks Books,* 48 F.3d at 224–25; *11126 Baltimore Blvd.,* 32 F.3d at 116–17; *Redner,* 29 F.3d at 1501–02 n. 9. Another track seems to indicate that common-law writ of certiorari is a sufficient procedural safeguard,

*Graff,* 9 F.3d at 1324–25, and that the state must only offer a fair opportunity to complete the administrative process and access to the courts within a brief period, not that the total licensing process including judicial review must be completed within a brief period. *TK's Video,* 24 F.3d at 709.

11. As we stated in *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 64 n. 18 (Colo.1981):

> Although under some circumstances public expression may be regulated by a narrowly drawn governmental licensing scheme, *see Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), the viability of any legislation which predicates eligibility for a license or permit on the content of the message sought to be conveyed is highly questionable. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *see also Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

guarantees of liberty of the press in state constitutions: "[ ] ... Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the states, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits...."

*Near v. Minnesota, ex rel. Olson,* 283 U.S. 697, 717–18, 51 S.Ct. 625, 631–32, 75 L.Ed. 1357 (1930) (citing Report on the Virginia Resolutions, Madison's Works, vol. iv, 544); *see Schneider v. State,* 308 U.S. 147, 161–64, 60 S.Ct. 146, 150–52, 84 L.Ed. 155 (1939). We have recognized that not all forms of expression enjoy the same level of constitutional protection afforded political speech. *7250 Corp. v. Board of County Comm'rs,* 799 P.2d 917, 922 (Colo.1990); *see Young v. American Mini Theatres,* 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (plurality opinion). However, certain avenues of regulation of constitutionally protected expression are foreclosed by the very framework of the Constitution. For example, regulation designed to control the divisive effects of speech is generally thought to be permissible, while regulation seeking to remove the cause of such effects is not.[12]

Section 8–9–105(A) of the Ordinance provides that a sexually oriented business license shall issue within thirty days of receipt of the application unless the licensing officer finds the presence of one or more of the following six provisions, in which case the license must be denied: (1) an applicant is under twenty-one years of age; (2) the applicant is not of good moral character; (3) the

applicant is overdue in payment of taxes, fees, fines, or penalties; (4) the applicant has not provided all information reasonably necessary or falsely answered a question on the application form; (5) the premises has not been approved by the fire, building, and licensing inspections; and (6) the applicant has not been issued a zoning permit that is not subject to appeal. The Ordinance also prohibits persons under twenty-one years of age from becoming customers of sexually explicit business licensees. The trial court, applying the *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), test of intermediate scrutiny that we adopted in *7250 Corporation,* found that the age and good moral character requirements of the Ordinance exceeded the scope necessary to further the governmental interest. The trial court also held that section 8–1–801(D) of the Code, authorizing suspension of a license for violation on the premises by any licensee, agent or employee, of any law of the United States, the State of Colorado, or the City of Colorado Springs, violated First Amendment constitutional standards. We affirm these conclusions, though on grounds different from those relied upon by the trial court, with the exception of the conclusion that the age limitations contained in the Ordinance are unenforceable with respect to licensees offering live, nude dancing performances. We reverse the trial court's judgment in that respect.

1

In *7250 Corporation,* we applied the *O'Brien* test in concluding that a county ordinance imposing a minimum age restriction of twenty-one years on employees and custom-

---

12. James Madison expressed this view as follows:

There are two methods of curing the mischiefs of faction: the one, by removing its causes; the other, by controlling its effects. There are again two methods of removing the causes of faction: the one by destroying the liberty which is essential to its existence; the other, by giving to every citizen the same opinions.... It could never be more truly said than of the first remedy, that it is worse than the disease. Liberty is to faction, what air is to fire, an aliment without which it instantly expires. But it could not be a less folly to abolish liberty, which is essential to political life, be-

cause it nourishes faction, than it would be to wish the annihilation of air, which is essential to animal life, because it imparts to fire its destructive agency. The second expedient is as impracticable, as the first would be unwise. As long as the reason of man continues fallible, and he is at liberty to exercise it, different opinions will be formed.... The inference to which we are brought, is, that the *causes* of faction cannot be removed; and that relief is only to be sought in the means of controlling its *effects.*

*The Federalist No. 10,* at 58–60 (James Madison) (J. Cooke, ed. 1961) (emphasis in original).

ers of commercial nude dancing establishments did not violate First Amendment standards. We applied this intermediate level of scrutiny because of our determination that the expressive component of this constitutionally protected mode of expression is "secondary to the conduct itself, and, as such, cannot be considered one of the more traditional forms of expression at the core of the Free Speech Clauses of the United States or Colorado Constitution." *7250 Corp.*, 799 P.2d at 922. The combination of "speech" and "nonspeech" elements in the same course of conduct is a form of expression entitled to some degree of constitutional protection, but "[a]s the mode of expression moves from pure speech to conduct, however, the scope of permissible state regulation increases." *Id.* Based on this more deferential intermediate standard of review accorded expressive conduct, we held as follows:

> In light of the evidence concerning reported property destruction and criminal activity associated with nude entertainment establishments, we may reasonably presume that the age restrictions in the ordinance reflect a legitimate legislative judgment by the county commissioners that youths under 21 years of age should be protected from the potentially harmful consequences associated with such establishments. We are loath to second guess the county commissioner's judgment in this respect.

*Id.* at 926 (footnote and citations omitted).

The trial court correctly perceived that the Ordinance has a much broader scope than the county regulation at issue in *7250 Corporation.* The Ordinance regulates all sexually oriented businesses, not just nude dancing establishments. This distinction is important because expression that does not involve conduct receives a greater degree of protection than does expression that is "mixed" with conduct. Book stores, video stores, and movie theaters stand on a different First Amendment footing than do nude dancing establishments. We reaffirm our holding in *7250 Corporation* that twenty-one-year-old age limitations are reasonable regulations with regards to live, nude dancing establishments. However, establishments that do not provide live, nude entertainment present a different question because there is no conduct involved in the expression that is sought to be regulated.

The City argues that the twenty-one-year-old age requirement reflects a reasonable legislative judgment that persons under the age of twenty-one should be protected from the potentially harmful consequences of sexually oriented businesses.[13] This argument is based on the assumption that adults under twenty-one years of age are more likely to be adversely affected by prostitution and solicitation than are other adults. However, the City produced no evidence to support that assumption. Moreover, for purposes of prior restraint analysis, it is not enough that the government's ends are compelling; the means selected to further those ends must be narrowly tailored. *See Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989) (statute designed to protect children from exposure to indecent dial-a-porn messages not sufficiently narrowly drawn since it denied adults their free speech rights by allowing them access only to what was acceptable for children). Assuming *arguendo* that the governmental interest in protecting eighteen to twenty year old adults is identical to the governmental interest in protecting minors, seeking to protect persons who may be particularly vulnerable from the secondary effects of a specified category of speech is not a permissible avenue of regulation. *R.A.V. v. City of St. Paul, Minn.*, —— U.S. ——, ——, 112 S.Ct. 2538, 2549, 120 L.Ed.2d 305 (1992). The court stated in *R.A.V.:*

> As [the United States Supreme Court] said in *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), "[l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton.*" *Id.*, at 321, 108 S.Ct., at 1163–1164.

---

13. The City compares this decision to protect persons between 18 and 20 years of age from sexually explicit speech to governmental judgments as to the appropriate age for other activities including driving, sexual relations, and the consumption of alcoholic beverages. This analogy is inapposite, however, because these activities involve only conduct, not constitutionally protected expression.

"The emotive impact of speech on its audience is not a 'secondary effect.'" *Ibid.* See also *id.,* at 334, 108 S.Ct. at 1170–1171. (opinion of Brennan, J.).

*R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2549 (footnote omitted). As Justice O'Connor wrote in *Boos:*

> [I]f the ordinance ... was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would [be] appropriate. The hypothetical regulation targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech.

*Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988) (plurality opinion). "[B]ecause non-obscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment," *United States v. X–Citement Video, Inc.,* —— U.S. ——, ——, 115 S.Ct. 464, 469, 130 L.Ed.2d 372 (1994) (citing *Alexander v. United States,* 509 U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), slip op. at 4–5; *Sable Communications of Cal., Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989); *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 224, 110 S.Ct. 596, 603–04, 107 L.Ed.2d 603 (1990) (plurality opinion); *Smith v. California,* 361 U.S. 147, 152, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1959)), there can be no doubt that 18 to 20 year olds fall within our constitutional command that "*every* person shall be free to speak," Colo. Const. art. II, § 10 (emphasis added). While the City may in some manner directly regulate the harmful consequences of expression, it may not generally prohibit the availability of all such expression to a class of adults. We thus conclude that sections 8–9–105(A)(1) and 8–9–112 of the Ordinance are not narrowly tailored to further the government's purpose, except with respect to licensees presenting live nude entertainment.

### 2

■ Section 8–9–105(A)(2) provides that a license application shall be denied if "[t]he applicant is not of good moral character."

For purposes of this section, a person who has been convicted of any felony or crime of moral turpitude is not a person of good moral character. Observing that the interest being addressed by this section "would not be furthered by denying a license to a person convicted of the felony of driving after judgment prohibiting," the trial court held that the section exceeded the scope necessary to further the asserted governmental interests in reducing crime, disease, and urban blight.

The City contends that this requirement reflects a reasonable legislative judgment that persons of bad moral character are more likely to engage in or tolerate criminal activities. We disagree.

■ While it is true, as the City points out, that character checks are required in other licensed activities, the extent to which a licensing authority may exercise discretion in the granting or withholding of a license depends upon the type of business or vocation which is involved. However, even when the character of an applicant is properly subject to evaluation by a licensing authority, the standards for excluding persons from engaging in the licensed activity must bear a reasonable relationship to the qualifications to engage in that activity. *Schware v. Board of Bar Exam'rs,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957).

■ Governmental decisions to license activities protected by the First Amendment must be narrowly tailored to ensure the absence of censorship. "Although a municipality may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion." *Schneider v. State,* 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). A licensing provision prohibiting the ability of an applicant to engage in commercial activities protected by the First Amendment on the basis of prior misconduct can be sustained only on the basis of evidence that serious criminal conduct would result from granting that license. Criminal laws are particularly designed to effectuate that deterrent purpose. When faced with a

similar ordinance, the California Supreme Court stated as follows:

No such clear and present danger appears. We cannot assume that because [an applicant] was once convicted ... [the applicant will violate the law] again, or that if [the applicant] does so, criminal sanctions will not afford an adequate remedy.... To interpret the ordinance in this case to permit denial of a license because of a past conviction ... would do more than create a hazard to protected freedoms; it would suppress them all together.

*Perrine v. Municipal Court*, 5 Cal.3d 656, 97 Cal.Rptr. 320, 488 P.2d 648, 653 (1971) (denial of license for bookstore upon the ground of prior criminal conviction invalid prior restraint); *accord Alexander v. City of St. Paul*, 227 N.W.2d 370 (Minn.1975) (movie theater operation); *Seattle v. Bittner*, 81 Wash.2d 747, 505 P.2d 126 (1973) (same). In general, constitutionally protected expression cannot be prohibited on the basis of discretionary evaluation of the character of the commentator. *See Near*, 283 U.S. at 720, 51 S.Ct. at 632 ("If, however, the publisher has a constitutional right to publish, without previous restraint ... [h]e does not lose his right by exercising it."); *Schneider*, 308 U.S. at 158, 60 S.Ct. at 149 (municipal ordinance prohibiting solicitation and distribution of circulars unless licensed by the police after an inquiry into applicants "good character" invalid prior restraint and censorship); *Staub v. City of Baxley*, 355 U.S. 313, 321, 78 S.Ct. 277, 281–82, 2 L.Ed.2d 302 (1958) (ordinance invalid on its face because it conditions enjoyment of the constitutionally guaranteed freedom of speech upon discretion of Mayor and City Council to consider "the character of the applicant" and the effects of solicitation upon "the general welfare" of the city, and thereby constitutes an invalid prior restraint); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418–19, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971) (injunction which suppresses, "on the basis of previous publications" distribution of literature invalid prior restraint); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969) ("[A] municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak ... according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community."); *Conrad*, 420 U.S. at 555, 95 S.Ct. at 1244–45 (denial of application in anticipation that the production would violate the law gave public officials the power to deny use of a forum in advance of actual expression and thus is an impermissible prior restraint); *Vance v. Universal Amusement Co.*, 445 U.S. 308, 311 n. 3, 100 S.Ct. 1156, 1159 n. 3, 63 L.Ed.2d 413 (1980) (nuisance statute construed as authorizing state judges to enjoin future exhibition of films not yet found to be obscene on basis of a showing that a theater exhibited obscene films in the past is unconstitutional as authorizing an invalid prior restraint. "[T]he state made the mistake of prohibiting future conduct after a finding of undesirable present conduct. When that future conduct may be protected by the first amendment, the whole system must fail....").

In this case, the City offered no evidence to suggest that persons convicted of serious traffic infractions are likely to commit the pernicious criminal conduct it properly seeks to contain. Criminal sanctions also prevent such future criminal conduct. The licensing provision sweeps too broadly, as the trial court concluded.

### 3

Section 8–9–104(E) provides that the applicant and every person who has a five percent or greater interest in the business, company, or corporation "must sign the application for a license." Sections 8–9–106 and 8–9–107 require that managers and employees be registered with the licensing officer. The trial court held that "[i]t is reasonable and necessary that the government know ... the names and addresses of the owners and managers in order to enforce the ordinance." Although the City is not seeking a list of the patrons or members of an organization, *cf. N.A.A.C.P. v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), disclosure of the requested information could result in chilling constitutionally protected expression. Because these disclosure provisions constitute conditions precedent to obtaining a li-

cense, they are subject to strict scrutiny analysis. *See Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976).

The City asserts two interests in support of these disclosure requirements: the need to prevent persons of bad moral character from engaging in a business associated with criminal activity, and to ensure that these individuals can be located, identified, and prosecuted in the event any violation of the provisions of the Ordinance occurs. As we have noted, the exercise of First Amendment rights cannot be curtailed on the basis of the communicator's general moral character. However, the City's interest in accountability *after* a violation of the Ordinance has occurred is significant. Thus the question becomes whether the information sought is narrowly tailored and sufficiently related to the City's interest in enforcing the Ordinance.

■■ Section 8–9–104(E) of the Ordinance provides as follows:

> If the applicant is an individual, that person must sign the application for a license. If the applicant is other than an individual, every person who has a five percent (5%) or greater interest in the business must sign the application for a license. If the applicant is a corporation, every person owning five percent (5%) or more of the outstanding shares of any class of stock, all officers, and all directors of the corporation must sign the application for a license. If the applicant is a limited liability company, every member holding a five percent (5%) or greater interest in the company and every manager must sign the application for a license.

We conclude that with the exception of the requirement that stockholders of a corporate applicant sign the application, the provisions of section 8–9–104(E) of the Ordinance are constitutionally appropriate. Because stockholders of a corporation are not in a position to carry out corporate policies or to respond promptly to notification of an Ordinance violation, the requirement that they sign an application is not justifiable. *Acorn Inv., Inc. v. City of Seattle,* 887 F.2d 219, 226 (9th Cir.1989). The Ninth Circuit Court of Appeals addressed this issue as follows:

> Because officers and directors, not shareholders, are legally responsible for the management of a corporation's business, we fail to see how the city's interest in accountability is served by notifying shareholders [of violations of the ordinance]. These are management, not shareholder, concerns. If panorama booths fail to comply with the ordinance, the City is free to take appropriate enforcement action against the corporation and its officers and directors. The most obvious remedy available to the City is to put the corporation out of the panorama business by revoking its city licenses. In the end, the shareholders will be held accountable in the only way they can be held accountable— through a diminution of the value of their stock. But that will happen automatically whether or not their names are disclosed to the City. In short, there is no logical connection between the City's legitimate interest in compliance with the panorama ordinance and the rule requiring disclosure of the names of shareholders.

*Id.* at 226; *see also T.K.'S Video, Inc. v. Denton County, Tex.,* 830 F.Supp. 335, 343 (E.D.Tex.1993); *Ellwest Stereo Theater, Inc. v. Boner,* 718 F.Supp. 1553, 1565–67 (M.D.Tenn.1989). We agree with the reasoning of *Acorn Investments.* We therefore reverse that portion of the trial court's judgment concluding that the provisions of section 8–9–104(E) of the Ordinance are enforceable as to stockholders of license applications.

■■ Section 8–9–106(C) of the Ordinance provides that "[t]he Licensing Officer shall register a manager if all of the requirements for a license as set forth under parts (3) and (4) of Article 1 of this Chapter and section 8–9–105 of this Chapter are met." We have concluded that the character and age restrictions contained in sections 8–9–105(A)(1) and 8–9–105(A)(2) of the Ordinance are unenforceable. Thus they cannot be enforced with respect to managers. Although the precise provisions of parts (3) and (4) of the Code were not included in the record on appeal, they appear generally to establish requirements and application procedures for all licenses. Section 8–1–401(A) of the Code requires applicants to be of "good moral

character." For the reasons previously indicated, we conclude that this section violates constitutional prohibitions against prior restraints and may not be applied to applicants for licenses governed by the Ordinance. *Cf. Genusa v. City of Peoria,* 619 F.2d 1203, 1216 (7th Cir.1980).

■ Section 8–9–107 of the Ordinance provides for employee registration as follows: "Each licensee will provide to the Licensing Officer the full name, aliases if any, address, telephone number and date of birth of any employee within five (5) days of employment." This information is reasonably necessary to effectuate the objectives of the Ordinance of suppressing criminal conduct. *Ellwest Stereo Theater,* 718 F.Supp. at 1566. While the requirement of the disclosure of aliases is problematical, the City's need to notify license holders if employees violate provisions of the Ordinance is of sufficient concern to justify such requirement. *But see Genusa,* 619 F.2d at 1216 ("The alias disclosure requirement involves an invasion of privacy not justified by the [governmental] interest and is not otherwise justified. It is therefore invalid.").

**4**

At oral argument, plaintiffs' counsel asserted that section 8–9–105(A)(4) of the Ordinance impermissibly failed to establish any scienter requirement in authorizing denial of a license if "[a]n applicant has failed to provide information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form." However, the plaintiffs did not raise this issue in their briefs and the record on appeal does not contain other portions of the Code that may relate to general requirements applicable to all license applicants. Under these circumstances, we do not address this argument.

■ Section 8–9–105(A)(3) of the Ordinance authorizes denial of a license application for failure to pay certain City assessments. Sections 8–9–105(A)(5) and –105(A)(6) require prior compliance with fire, building, and zoning procedures. These ministerial requirements do not grant broad discretion to the licensing officer and are narrowly tailored to further the City's interest in ensuring safe facilities and preventing neighborhood blight. *See Alexander,* 227 N.W.2d at 373 n. 7; *Bittner,* 505 P.2d at 133 (Finley, J., concurring); *Perrine,* 488 P.2d at 652 n. 9. We reject the plaintiffs' arguments that these Ordinance provisions constitute impermissible prior restraints of constitutionally protected activity.

■ Section 8–9–108 of the Ordinance authorizes inspections for the "purpose of ensuring compliance" with the law. Such inspections must be conducted in a "reasonable manner and only as frequently as may be reasonably necessary." Colorado Springs, Co., Code § 8–9–108 (1992). Section 8–9–110(A) of the Ordinance provides for the suspension or revocation of a license for a period not to exceed six months if the licensing officer determines that a licensee or an employee of a licensee has violated or is not in compliance with the Ordinance; has refused to allow an authorized inspection of the premises; or has knowingly permitted any unlawful act upon the premises. Section 8–9–110(B) establishes eighteen aggravating and mitigating circumstances for consideration by the licensing officer in exercising the authority established by section 8–9–110(A). The City has a substantial interest in ensuring compliance with the Ordinance, and inspections are well suited to such a task. The City also has a substantial interest in preventing unlawful conduct on the premises. The guidelines established by section 8–9–110(B) narrow the authority granted by section 8–9–110(A) and thus limit the discretion of the licensing officer. We reject the plaintiffs' arguments that these provisions are not sufficiently tailored to further the admittedly substantial governmental interests of the City.

■ Section 8–9–111 of the Ordinance requires mandatory license revocation for one year if one of the following six factors is found by the licensing officer to exist:

1. A license has previously been suspended within the preceding twelve (12) months;

2. A licensee gave false information in the material submitted to the Licensing Officer;

3. A licensee or employee has knowingly allowed possession, use, or sale of controlled substance [sic] as defined in Part 3 of Article 22 of Title 12 C.R.S. on the premises;

4. A licensee or an employee has knowingly allowed prostitution on the premises;

5. A licensee or an employee knowingly operated the sexually oriented business during a period of time when the license was suspended; or

6. Excluding conduct within a private room of an adult motel, a licensee or employee has knowingly allowed any act of sexual intercourse, sodomy, oral copulation, masturbation, or other sexual conduct to occur on the premises.

The First Amendment does not bar enforcement of regulations directed at unlawful conduct that manifests no element of protected expression. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). A business engaging in constitutionally protected activities does not enjoy First Amendment immunity from criminal prosecution. *O'Connor v. City and County of Denver*, 894 F.2d 1210, 1220 (10th Cir.1990) (First Amendment not implicated by closure of theaters which exhibited sexually explicit movie picture films where theaters were closed because of a significant number of acts of public indecency occurring on their premises). These provisions of the Ordinance are specific and narrow in scope. They limit the discretion of the licensing officer to revoke a license, and, in our view, do not constitute prior restraints. Furthermore, as we note below, the provisions of the Ordinance related to suspension and revocation of issued licenses are more appropriately viewed as time, place, and manner restrictions.

In summary, we conclude that the age limitations contained in sections 8–9–105(A)(1) and 8–9–112, except as they are directed at licensees presenting live, nude entertainment; the disclosure provisions of section 8–9–104(E) as applied to corporate shareholders; and the good moral character provisions contained in section 8–9–105(A)(2) of the Ordinance and section 8–1–801(D) of the Code constitute invalid prior restraints and are not enforceable. The remaining portions of the Ordinance do not constitute prior restraints on constitutionally protected expression or conduct.

## IV

The plaintiffs argue alternatively that the Ordinance is a content-based regulation, that it does not serve a compelling state interest, and that it is not narrowly drawn to accomplish any such purpose. We reject these arguments.

We have determined that although the Ordinance significantly impacts protected expression, with few exceptions the procedural safeguards contained therein satisfy constitutional criteria fashioned to insure that governmental entities do not impermissibly restrain such expression. In so doing, we relied upon the prior restraint jurisprudence recently articulated by the United States Supreme Court in *FW/PBS Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion). Because the Court in *FW/PBS* found that the Dallas ordinance on its face constituted an impermissible prior restraint on protected expression, the Court did not address additional time, place, and manner issues raised by the parties. In this case we must consider such issues.

## A

All types of non-obscene expression, including sexually explicit expression, whether consisting of printed matter, videos, films, or live entertainment, are protected by the First Amendment. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (live nude dancing); *cf. Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2464–65, 49 L.Ed.2d 310 (1976) (motion picture theaters); *Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959) (bookstores); *Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123, 130 (3d Cir.1993); *Marco Lounge,*

*Inc. v. City of Federal Heights,* 625 P.2d 982, 985 (Colo.1981) (live, nude entertainment). Government efforts to regulate the content of non-obscene expression, whether by means of zoning regulation, licensing programs, or other means, are presumed to violate the First Amendment. *See City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984). The government thus may not limit the content of such expression, however objectionable or offensive that content might be to many. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272–73, 45 L.Ed.2d 125 (1975); *Coates v. City of Cincinnati,* 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971); *see also American Mini Theatres,* 427 U.S. at 85, 96 S.Ct. at 2459–60. (Stewart, J., dissenting). Protection of the right to express controversial ideas in controversial ways is at the heart of the values embodied in the First Amendment. *Cohen v. California,* 403 U.S. 15, 24–25, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284 (1971); *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969); *see also American Mini Theatres,* 427 U.S. at 86–87, 96 S.Ct. at 2460–61 (Stewart, J., dissenting).[14]

■ Government regulations that do not directly or indirectly limit the content of protected expression but seek only to impose time, place, and manner regulations on such expression are constitutionally permissible only if they are narrowly crafted to further a substantial governmental interest and preserve ample alternative means of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 798–99, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989); *Renton,* 475 U.S. at 46–48, 106 S.Ct. at 928–29; *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293,

104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984); *Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. at 2128–29; *see Marco Lounge,* 625 P.2d at 987 n. 6. In view of these principles, courts addressing First Amendment challenges to time, place, and manner regulations have traditionally determined initially whether the regulations are content-based or content-neutral and then, depending on the answer to that question, applied the appropriate level of scrutiny to the regulations. *City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2047, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring) (citations omitted). However, the Ordinance, while designed to impose time, place, and manner regulations, by its terms singles out a specific type of defined, constitutionally protected expression—sexually oriented expression—for regulation. Thus it is in fact indirectly content oriented; its time, place, and manner restrictions impact and thus limit constitutionally protected expression precisely because the regulated businesses have chosen to engage in that type of expression.

Efforts to develop a framework for First Amendment analysis of such hybrid ordinances have proved difficult. *See Note, The Content Distinction in Free Speech Analysis after Renton,* 102 Harv.L.Rev. 1904 (1989); Ronald Stern, Note, *Sex, Lies, and Prior Restraints: "Sexually Oriented Business"— The New Obscenity,* 68 U.Det.L.Rev. 253 (1991); Gianni Servodidio, Note, *The Devaluation of Nonobscene Eroticism As a Form of Expression Protected by the First Amendment,* 67 Tul.L.Rev. 1231 (1993). In *American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440 (plurality opinion), a divided Supreme Court addressed Equal Protection and First Amendment challenges to two Detroit, Michigan, ordinances restricting the location of adult motion picture theaters presenting sexually expressive activities to the public. The ordinances prohibited locating new adult motion picture theaters within 1,000 feet of two other regulated uses.[15] A plurality of four

---

**14.** This sentiment can be traced back to a comment attributed to Voltaire: "I disapprove of what you say, but I will defend to the death your right to say it." S. Tallentrye, *The Friends of Voltaire* 199 (1907); *see 7250 Corp. v. Board of County Comm'rs,* 799 P.2d 917, 922 (Colo.1990).

**15.** The ordinance also affected other entities such as adult bookstores, cabarets, certain establishments selling liquor for consumption on the premises, hotels, motels, pawnshops, pool or billiard halls, public lodging houses, secondhand stores, shoeshine parlors, and taxi dance halls.

members of the Court endorsed the view that different regulatory standards for different types of expression were compatible with First Amendment analysis; concluded that the ordinances did not constitute prior restraints; and held that the ordinances were content-neutral and survived intermediate time, place, and manner scrutiny. Four other members of the Court concluded that the ordinances did constitute prior restraints and also embodied content-based unreasonable time, place, and manner restrictions. *Id.* at 85, 96 S.Ct. at 2459–60 (Stewart, J., dissenting).

Although Justice Powell agreed with the plurality's conclusion that the ordinances did not constitute prior restraints on constitutionally protected expression, he rejected the plurality's suggestion that non-obscene erotic expression was not guaranteed the same First Amendment protection as other modes of expression. *Id.* at 73 n. 1, 96 S.Ct. at 2453 n. 1 (Powell, J., concurring). He viewed the ordinances as general zoning requirements that affected First Amendment concerns "only incidentally and to a limited extent." *Id.* at 73, 96 S.Ct. at 2454 (Powell, J., concurring). Observing that the ordinances did not affect the freedom of adult movie makers to create such movies and only minimally restricted the interests of those who wished to view them, he found the four-part intermediate scrutiny test established in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), to be applicable. *American Mini Theatres,* 427 U.S. at 78–80, 96 S.Ct. at 2456–57 (Powell, J., concurring). As we observed in *Marco Lounge,* 625 P.2d at 987 n. 7, the conclusion in *American Mini Theatres* that reasonable time, place, and manner restrictions could be imposed governmentally on speech of a specified content deviated from prior First Amendment cases.[16] Prior to *American Mini Theatres,* governmental restrictions affecting constitutionally protected expression were generally considered to be content-based and presumptively invalid, warranting strict scrutiny analysis. *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). The Court has not abandoned that mode of analysis for regulations deemed to be content-based. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2047, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring). However, the secondary-effects rationale articulated by Justice Powell in his concurring opinion in *American Mini Theatres* was embraced by the Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986), wherein a majority rejected First Amendment challenges to a city ordinance prohibiting defined adult picture theaters from locating within 1000 feet of specified zones. The ordinance in effect confined such defined theaters to a limited geographical area of the city. The *Renton* majority found the ordinance to be content-neutral; observed that the City of Renton was entitled to rely on evidence that in Seattle, Washington, these particular types of movie theaters caused negative effects on surrounding areas; and emphasized the fact that the ordinance did not completely prevent the establishment of such theaters. *Renton,* 475 U.S. at 48–54, 106 S.Ct. at 929–33.

The Court recently reviewed its First Amendment jurisprudence in *City of Ladue*

---

*American Mini Theatres,* 427 U.S. at 52 n. 3, 96 S.Ct. at 2444 n. 3.

**16.** It has been noted by many commentators that the *American Mini Theatres—Renton* line of cases are aberrational in the sense that they apply a relaxed level of review to ordinances that could be characterized as making content-based distinctions, thus distorting traditional freedom of expression analysis in a questionable fashion. *See, e.g.,* Martin Redish, *The Content Distinction in First Amendment Analysis,* 34 Stan.L.Rev. 113, 127–28 n. 102 (1981) (discussing *American Mini Theatres* and noting that the case involved subject matter categorization rather than direct view-point regulation); Note, *The Content Distinction in Free Speech Analysis after Renton,* 102 Harv. L.Rev. 1904, 1907–12 (1989) (arguing that the secondary effects doctrine should be confined to restrictions based on subject matter and not extended to restrictions based on viewpoint); Ronald Stern, Note, *Sex, Lies, and Prior Restraints: "Sexually Oriented Business"—The New Obscenity,* 68 U.Det.L.Rev. 253, 279–85 (1991); Gianni Servodidio, Note, *The Devaluation of Nonobscene Eroticism As a Form of Expression Protected by the First Amendment,* 67 Tul.L.Rev. 1231, 1236–41 (1993).

*v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), wherein it unanimously held that a municipal ordinance designed to reduce aesthetically objectionable visual clutter by restraining the rights of homeowners to display signs on their properties violated First Amendment protections of free speech. The ordinance contained ten exemptions for particular types of signs, such as signs identifying churches, religious institutions, schools, other non-profit organizations, danger, directions, public transportation stops, and sale or rental property. The Court concluded that the ordinance in effect foreclosed an entire medium of expression and impermissibly failed to ensure adequate alternative means of expression. *Id.* at —— – ——, 114 S.Ct. at 2045–46. In a concurring opinion, Justice O'Connor commented upon what she described as the Court's "unusual" election to assume that the exemptions contained in the Ordinance were content-neutral and emphasized that such approach did not represent any departure from the Court's "normal" analytical approach of first determining whether the regulation is content-neutral and then, depending on the answer to that question, applying the proper level of scrutiny. *Id.* at ——, 114 S.Ct. at 2047 (O'Connor, J., concurring).

■ Although the ordinance adopted by the City affects particular entities only because such entities engage in activities that implicate constitutionally protected rights of expression, we conclude that its suspension, revocation, and premises design provisions must be deemed content-neutral for purposes of First Amendment analysis. Those provisions of the Ordinance are designed to regulate undesirable secondary effects of such expressive conduct, not the substance thereof. One critical difference between highly suspect content-based regulations and somewhat less suspect content-neutral regulations may be that in the former case the government seeks to restrain conduct based on the particular message sought to be communicated while in the latter case the government seeks to control only the time, place, or manner of expression without regard to the particular message sought to be communicated. Of course, any regulation imposing limits on the time, place, or manner of expressing ideas necessarily limits to some extent the ability of the communicator to convey those ideas and the ability of the recipient to consider them. As the Court observed in *Ladue,* even presumably content-neutral regulations can so severely restrict a mode of communicating constitutionally protected expression that the regulations cannot survive even the reduced level of content-neutral scrutiny. *Id.* at —— – ——, 114 S.Ct. at 2045–46.[17]

In *7250 Corporation v. Board of County Commissioners,* 799 P.2d 917 (Colo.1990), this court upheld a county ordinance imposing restrictions on the operation of commercial establishments not subject to the licensure requirements of the Colorado Liquor Code that presented nude entertainment to their patrons. *Id.* at 925–26. The ordinance limited the hours and locations of such establishments and prohibited persons under twenty-one years of age from patronizing such entities. In upholding the facial validity of the ordinance, we applied the intermediate scrutiny test elaborated by the Supreme Court in *O'Brien,* 391 U.S. 367, 88 S.Ct. 1673. *7250 Corp.,* 799 P.2d at 924. We also observed that application of the *O'Brien* standard is appropriate only where the govern-

---

**17.** The City contended at oral argument that while a book or a film is pure speech, the business of distributing such material is conduct, not pure speech. However, the constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). "Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint." *Near v. Minnesota ex rel. Olson,* 283 U.S. 697,

720, 51 S.Ct. 625, 632, 75 L.Ed. 1357 (1931). Thus, where First Amendment activities are involved, licensing ordinances are subject to strict scrutiny. *Sunset Amusement Co. v. Board of Police Comm'rs of L.A.,* 7 Cal.3d 64, 101 Cal.Rptr. 768, 772, 496 P.2d 840, 844 (1972). But, we agree with the City's contention that regulation of conduct *on the premises* (as opposed to the "conduct" of circulating sexually explicit expression) of a sexually oriented business is not subject to the heightened scrutiny analysis for regulations directly affecting pure speech. *See Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705, 106 S.Ct. 3172, 3176–77, 92 L.Ed.2d 568 (1986).

mental regulations are content-neutral. *Id.* at 923.

In this case, the Ordinance does not on its face purport to regulate political speech. However, a variety of specifically defined activities are regulated thereby. Businesses offering nude dancing entertainment are deemed to be cabarets and are subject to the Ordinance. Our discussions in *Marco Lounge* and *7250 Corporation* dealt only with government regulation of that particular type of commercial establishment. The Ordinance also applies to motion picture theaters, motels, bookstores, and video stores. Ordinances deemed to be content-neutral restricting the location, time, and manner of operation of such businesses have been accorded intermediate levels of judicial scrutiny. *See, e.g., Renton,* 475 U.S. 41, 106 S.Ct. 925; *American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440 (plurality opinion); *TK's Video,* 24 F.3d 705. However, licensing regulations affecting certain of these types of enterprises have also been subjected to strict scrutiny analysis. *See, e.g., FW/PBS,* 493 U.S. 215, 110 S.Ct. 596 (plurality opinion).

We have concluded that some provisions of the Ordinance regulating the license application process constitute impermissible prior restraints on constitutionally protected expression. However, those provisions of the Ordinance related to revocation and suspension of licenses and establishing criteria for the operation and design of premises are of a different nature. While it is true that partial or total deprivation of the right to continue constitutionally protected modes of expression may in some circumstances appear to be the equivalent of a denial of all protected expression, it does not appear on the face of the Ordinance that all or a great portion of such protected activity will be curtailed by the application of the standards for suspension, revocation, premises design, and premises operation established thereby. We conclude that the suspension, revocation, and premises design provisions of the Ordinance are not content oriented and are therefore subject to intermediate scrutiny analysis. The four-part test established in *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679, is appropriate

for such analysis. *7250 Corp.,* 799 P.2d at 924.

We conclude, as did the trial court, that the Ordinance was adopted pursuant to the City's constitutional authority and furthers the substantial governmental interests of reducing incidents of criminal conduct and preventing neighborhood blight. *American Mini Theatres,* 427 U.S. at 71, 96 S.Ct. at 2452–53 (plurality opinion); *7250 Corp.,* 799 P.2d at 924–25. As previously indicated, we also conclude that the revocation, suspension, premises design, and premises operation provisions of the Ordinance, albeit applicable only to businesses classified on the basis of the fact that they are commercial purveyors of constitutionally protected forms of expression, primarily regulate the secondary effects of such expression, and should be deemed content-neutral. Because the provisions of the Ordinance challenged by the plaintiffs to some degree limit constitutionally protected speech, we must determine whether they are narrowly tailored to further the public interest served by their adoption and whether they prohibit protected expression to no greater degree than is essential to further that public interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679; *7250 Corp.,* 799 P.2d at 925.

**B**

Section 8–9–109(A) of the Ordinance provides in pertinent part that a sexually oriented business license shall be revoked or suspended in the event the licensee or an agent or employee thereof violates any of the provisions of section 8–1–801 of the Code. Section 8–1–801(D) of the Code provides in pertinent part that the licensing officer shall suspend for a period not to exceed six months or revoke any license issued by the City if such officer finds:

> The licensee or any agent or employee of such licensee has violated any law of the United States, of the State of Colorado or the City of Colorado Springs when such violation occurred on the licensed premises, or relates to conduct or activity of any business required to be licensed by this Chapter.

The trial court held that insofar as it applied to sexually oriented business licenses, section 8–1–801(D) of the Code exceeded the scope necessary to further the asserted governmental interest in restricting constitutionally protected activity. We agree with this conclusion in the circumstances of this case.

Section 8–1–801(D) of the Code requires suspension or revocation of any license if a licensee or any agent or employee thereof violates any law. This section makes no reference to any mens rea requirement. It thus establishes a strict liability standard. Such regulations are constitutionally suspect for purposes of First Amendment analysis. *See United States. v. X–Citement Video, Inc.,* — U.S. ——, ——, 115 S.Ct. 464, 469, 130 L.Ed.2d 372 (1994); *cf. Smith v. California,* 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

■ In addition, as the trial court observed, section 8–1–801(D) of the Code is not narrowly tailored at all. Any violation of any legislative prohibition triggers mandatory suspension or revocation. Section 8–1–801 of the Code contains no criteria indicating what circumstances warrant suspension as opposed to revocation. Such a sweeping regulation, however appropriate in other contexts, is not narrowly drawn to insure maximum opportunity for constitutionally protected modes of expression. In view of the danger of censorship and arbitrary suppression inherent in the application of imprecise standards, regulations granting government officials excessive discretion to regulate constitutionally protected modes of expression are

unconstitutional on their face. *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *see Vance v. Universal Amusement Co.,* 445 U.S. 308, 311 n. 3, 100 S.Ct. 1156, 1159 n. 3, 63 L.Ed.2d 413 (1980). We agree with the trial court's conclusion that the provisions of section 8–1–801(D) of the Code are invalid as applied to sexually explicit business licensees.[18]

### C

■ Section 8–9–113 of the Ordinance provides that sexually oriented business licensees must cease commercial operations between the hours of 2:00 a.m. and 8:00 a.m. on Sundays, 12:00 a.m. and 7:00 a.m. on Mondays, and 2:00 a.m. and 7:00 a.m. on all other weekdays and Mondays that fall on January 1st. Section 8–9–114 of the Ordinance provides that all walls of peep booths shall be maintained in good repair and shall not feature holes, prohibits occupancy of any peep booth by more than one person at any one time, and contains several restrictions on the design of the interior of premises upon which peep booths are located. The provisions of section 8–9–115 of the Ordinance establish illumination standards for the interior portions of sexually explicit business premises. Section 8–9–116 of the Ordinance provides that entertainers in adult theaters or adult cabarets shall perform only upon designated fixed and immovable stages and that audience members may not be seated within three feet of the edge of a stage or go onto a stage.[19] Section 8–9–117 of the Ordi-

---

18. The Colorado Liquor Code authorizes the revocation of a liquor license when the licensee or employee thereof knowingly permits a violation on the licensed premises and also authorizes the denial of a license to an applicant not of good moral character. The defendants reason by analogy that the similar provisions of the Ordinance are also appropriate. However, in most circumstances the licensing of liquor establishments does not generally intrude upon constitutionally protected modes of expression. Furthermore, the Twenty–First Amendment to the United States Constitution confers something more than the normal police power accorded states in regulating liquor-licensed establishments. *See California v. LaRue,* 410 U.S. 948, 93 S.Ct. 1351, 35 L.Ed.2d 615 (1973); *Marco Lounge,* 625 P.2d at 987.

19. Because live, nude dancing is conduct with an expressive element, it should technically be analyzed under the *O'Brien* test. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion); *7250 Corporation v. Board of County Comm'rs,* 799 P.2d 917 (Colo.1990). However, the United States Supreme Court indicated in *Barnes* that the *Renton* time, place, and manner test parallels the *O'Brien* analysis. *Barnes,* 501 U.S. at 566, 111 S.Ct. at 2460 (plurality opinion). In *Mitchell v. Commission on Adult Entertainment Est.,* 10 F.3d 123, 130–31 n. 7 (3rd Cir.1993), the Third Circuit Court of Appeals observed that "regardless of whether the analytical framework of *O'Brien* or *Renton* is applied to the case at hand … the result would be the same."

nance provides that no licensee or employee thereof who interacts with the patrons shall be unclothed or leave any specified anatomical areas exposed, nor shall a licensee or employee encourage or knowingly permit any person upon the premises to touch, caress, or fondle such specified anatomical areas of any person. Finally, section 8–9–118 of the Ordinance provides that employee tips are to be placed in a special tip box and not handed directly to the entertainer. The plaintiffs assert that these provisions of the Ordinance are not sufficiently narrow in scope. We disagree.

These provisions of the Ordinance permit expression to proceed without reference to the content thereof. The contents of books, videos, and films are not censored. Dancers are not prohibited from communicating protected expression. The Ordinance does not regulate the expression communicated within peep booths. The regulations concerning stage location, seating, and premises containing peep booths are specific and detailed. Regulations of stage and audience locations have been upheld as valid time, place, and manner restrictions. *BSA, Inc. v. King County*, 804 F.2d 1104, 1111–12 (9th Cir. 1986). Limitations on hours of operation for live, nude entertainment were specifically approved by this court as content-neutral in *7250 Corporation*, 799 P.2d at 925. Peep booth regulations similar to those contained in the Ordinance have uniformly been deemed valid time, place, and manner restrictions. *See, e.g., Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123, 139–44 (3rd Cir.1993); *Bamon Corp. v. City of Dayton*, 923 F.2d 470, 474 (6th Cir.1991); *Postscript Enter. v. City of Bridgeton*, 905 F.2d 223, 227 (8th Cir.1990); *Doe v. City of Minneapolis*, 898 F.2d 612, 620 (8th Cir.1990); *Berg v. Health & Hosp. Corp. of Marion County, Ind.*, 865 F.2d 797, 802 (7th Cir.1989); *Wall Distrib., Inc. v. City of Newport News, Va.*, 782 F.2d 1165, 1170 (4th Cir.1986); *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1247 (9th Cir. 1982). In our view, these sections of the Ordinance are narrowly crafted and affect performance, audiences, and expressive creation in minimal ways only. They thus constitute valid time, place, and manner restric-tions on the conduct of sexually oriented business operations.

## V

The plaintiffs argue that the provisions of section 8–9–113 of the Ordinance limiting the hours of operation of licensed sexually oriented businesses are preempted by parallel provisions of the Colorado Liquor Code. We do not agree.

Pursuant to section 12–47–128(5)(c), 5B C.R.S. (1991), liquor licensed establishments are permitted, *inter alia,* to sell, serve, or distribute any malt, vinous, or spirituous liquors on any Monday through Saturday and on any Sunday which falls on December 31 beginning at 12:00 p.m. midnight until 2:00 a.m. and from 7:00 a.m. until 12:00 p.m. midnight, and on any other Sunday beginning at 12:00 p.m. midnight until 2:00 a.m. and from 8:00 a.m. until 8:00 p.m. According to the plaintiffs, these provisions preempt section 8–9–113 of the Ordinance insofar as the latter section further restricts the Monday morning hours of operation of liquor licensed establishments that elect to present sexually explicit entertainment. We disagree.

Pursuant to section 30–15–401(1)($l$)(I)(B), 12A C.R.S. (1986), the City has the authority to adopt "reasonable regulations for the operation of establishments open to the public in which persons appear in a state of nudity for the purpose of entertaining the patrons of such establishment" and such regulations may include "[l]imitations on the hours during which such establishments may be open for business...." In the area of live, nude, entertainment, the Colorado Department of Revenue has enacted regulations placing specific, strict limitations on such expression. *See Citizens for Free Enter. v. Department of Revenue*, 649 P.2d 1054, 1066–68 (Colo. 1982) (upholding such regulations); *see also 7250 Corp.*, 799 P.2d at 925–26 (recognizing that there are practical differences of constitutional relevance between liquor licensed establishments and nude entertainment establishments). In this case, the two-hour time differential for one day per week does not constitute a conflict where "the ordinance

authorizes what the state forbids, or forbids what the state has expressly authorized." *Sant v. Stephens,* 753 P.2d 752, 756–57 (Colo. 1988) (quoting *Aurora v. Martin,* 181 Colo. 72, 75, 507 P.2d 868, 869–70 (1973)); *cf. 7250 Corp.,* 799 P.2d at 925–26 (upholding limitation on hours of operation for nude entertainment establishment not permitted to sell liquor against free expression challenge).

## VI

 Section 8–9–121(9) of the Ordinance provides that "[i]f any section, subsection or clause of this Ordinance shall be deemed to be unconstitutional or otherwise invalid, the validity of the remaining sections, subsections and clauses shall not be affected thereby." The proper inquiry for determining the severability of specific provisions of the Ordinance thus focuses on whether the constitutionally valid provisions are complete in themselves and can, in turn, be given legal effect. *Williams v. Denver,* 198 Colo. 573, 576, 607 P.2d 981, 983 (1979). The City Counsel has clearly evidenced an intent for the constitutional provisions of the Ordinance to be given full effect regardless of what other provisions are found to be constitutionally invalid. We conclude that the non-discretionary standards applicable to sexually oriented business license applicants, and the reasonable time, place, and manner regulations of such businesses contained in the Ordinance are complete in themselves and can be given legal effect.

## VII

For the foregoing reasons, we *affirm* the trial court's judgment in part and *reverse* the judgment in part. We affirm the trial court's conclusion that section 8–9–105(A)(2) of the Ordinance, requiring denial of applications for licenses by persons not of good moral character, violates First Amendment standards, though on grounds different from those relied upon by the trial court. We also affirm the trial court's conclusion that section 8–1–801(D) of the Code and, by implication, section 8–9–110(A)(3) of the Ordinance, authorizing suspension or revocation of a license for any violation of any law, violates First Amendment standards.

We also affirm the trial court's determination that sections 8–9–105(A)(1) and 8–9–112 of the Ordinance, which provisions establish age limitations for licensees and audience members, are constitutionally invalid insofar as such restrictions apply to licensees and audience members of businesses not presenting live, nude entertainment. However, we reverse the trial court's judgment insofar as it holds that the age provisions of sections 8–9–105(A)(1) and 8–9–112 may not be enforced with respect to licensees and audience members of businesses that present live, nude entertainment. We also reverse the trial court's judgment upholding that portion of section 8–9–104(E) of the Ordinance requiring corporate shareholders to sign license application forms.

The judgment of the trial court is affirmed in all other respects.

ERICKSON, J., dissents, and LOHR, J., joins in the dissent.

Justice ERICKSON dissenting:

I respectfully dissent. I would reverse the El Paso County District Court and hold that Colorado Springs Ordinance No. 92–159 (Ordinance) violates the First Amendment to the United States Constitution by imposing a prior restraint on speech and is facially unconstitutional.

On March 19, 1993, the El Paso County District Court issued an order declaring certain sections of the Ordinance and a provision of the 1980 Colorado Springs Code (Code) unenforceable because of facial violations of the First Amendment of the United States Constitution. The appellants/cross-appellees, the City of Colorado Springs and the members of the Colorado Springs City Council (defendants), appeal those portions of the district court's order that declared part of the Ordinance unenforceable. The appellees/cross-appellants, .operators of sexually oriented business establishments (plaintiffs), appeal from those portions of the district court's order upholding the constitutionality of the Ordinance with portions of the Ordinance stricken.

The majority affirms the district court in part and reverses in part. I agree with the majority's First Amendment analysis of the substantive provisions in the Ordinance. However, the majority concludes that the Ordinance provides adequate procedural safeguards to applicants for licenses for sexually oriented businesses. Maj. op. at 289. I disagree. The Ordinance constitutes an unconstitutional prior restraint on speech because it fails to provide for adequate procedural safeguards to preserve freedom of speech guaranteed by the First Amendment. Accordingly, I would hold the licensing scheme provided in the Ordinance to be facially unconstitutional and reverse the judgment of the district court.

I

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Regulations enacted to restrain protected speech on the basis of content are presumptively unconstitutional. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986). If the restrictions are primarily directed at the noncommunicative aspects of protected speech, the government may regulate the time, place, and manner of protected speech. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989). Content-neutral time, place, and manner restrictions are permissible "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton,* 475 U.S. at 47, 106 S.Ct. at 928.

Prior restraints are judicial and administrative orders that forbid certain communications when issued prior to the time the communications are to occur. *Alexander v. United States,* —— U.S. ——, ——, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993). A governmental regulation that places a prior restraint on the exercise of free expression bears "a heavy presumption against its constitutional validity." *FW/PBS v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107

L.Ed.2d 603 (1990) (plurality opinion); *see, e.g., City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988); *Freedman v. Maryland,* 380 U.S. 51, 57, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965).

Freedom of speech is abridged when the government may exercise unbridled discretion in determining whether individuals may engage in protected speech. *FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. at 604–05. When a regulation that creates a prior restraint fails to provide for adequate procedural safeguards to ensure a prompt decision, the government has exercised the prohibited unbridled discretion. *Id.* at 227, 110 S.Ct. at 605–06.

In *Freedman,* the United States Supreme Court held that a Maryland law requiring film distributors to submit films to the Maryland State Board of Censors for approval was an unconstitutional prior restraint. *Freedman,* 380 U.S. at 60, 85 S.Ct. at 739–40. Three procedural safeguards are necessary, under *Freedman,* to "obviate the dangers of a censorship system": (1) any restraint prior to judicial review can only be imposed for no longer than necessary to preserve the status quo; (2) prompt judicial review must be available; and (3) the censor must bear the burden of going to court to suppress the speech and bear the burden of proof once in court. *Id.* at 58–59, 85 S.Ct. at 738–39. If a licensing scheme does not contain necessary procedural safeguards and "is made unduly onerous, by reason of delay or otherwise, [in providing for] judicial review, the censor's determination may in practice be final." *Id.* at 58, 85 S.Ct. at 738.

In *FW/PBS,* the Court examined the constitutionality of a Dallas ordinance that imposed a system of zoning and licensing requirements for sexually oriented businesses. The ordinance was directed toward combatting the secondary effects of urban blight and crime. In a plurality opinion, the Court held that the city's licensing scheme was an unconstitutional prior restraint because it failed to provide adequate procedural safeguards. *FW/PBS,* 493 U.S. at 229, 110 S.Ct. at 606–07. The Court identified two evils associated with the prior restraints imposed

by the Dallas ordinance. First, a licensing "scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *Id.* at 225–26, 110 S.Ct. at 605 (quoting *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988)). Second, a prior restraint is impermissible if it fails to place limits on the time within which the decisionmaker must issue the license. *Id.* at 226, 110 S.Ct. at 605.

The *FW/PBS* Court reviewed *Freedman* and concluded that *Freedman* involved direct censorship, which is presumptively invalid, while the Dallas ordinance involved issuing licenses to applicants, which is not presumptively invalid. *Id.* at 228, 110 S.Ct. at 606. The Court stated, "[b]ecause the licensing scheme at issue in this case does not present the grave dangers of a censorship system ... we conclude that the full procedural protections set forth in *Freedman* are not required." *Id.* (quoting *Freedman,* 380 U.S. at 58, 85 S.Ct. at 738).[20] The plurality determined the first two *Freedman* safeguards must be considered in evaluating a licensing scheme for sexually oriented businesses. *Id.* at 228–30, 110 S.Ct. at 606–07. The Court stated:

> The core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

*Id.* at 228, 110 S.Ct. at 606. Federal courts have reaffirmed the *FW/PBS* procedural

safeguards in the context of licensing schemes for sexually oriented businesses. *See, e.g., TK's Video, Inc. v. Denton County, Tex.,* 24 F.3d 705, 707–08 (5th Cir.1994); *Chesapeake B & M, Inc. v. Harford County, Md.,* 831 F.Supp. 1241, 1247 (D.Md.1993); *Wolff v. City of Monticello,* 803 F.Supp. 1568, 1573 (D.Minn.1992).

Section 8–9–104(A) of the Ordinance provides that "[i]t shall be unlawful for any person to operate a sexually oriented business without a license issued by the Licensing Officer under the provisions of this Chapter." (Footnote omitted.) The licensing scheme contained in the Ordinance constitutes a prior restraint because speech is subjected to governmental regulation prior to the time that the speech is to occur. *See FW/PBS,* 493 U.S. at 224–26, 110 S.Ct. at 603–05.

## II

### A

Section 8–9–104(D) of the Ordinance states that an application for a sexually oriented business license must be accompanied by a zoning permit. Section 8–9–105(A)(6) of the Ordinance provides, in relevant part:

> A. The sexually oriented business shall be issued a license within thirty (30) days after receipt of an application ... unless the Licensing Officer finds one or more of the following:
>
> ....
>
> 6. The applicant has not been issued a permit by the Zoning Administrator ... and that such permit, if issued, is not subject to appeal....

If the zoning permit is subject to appeal, section 8–9–104(D) provides that "no further action shall be taken upon such application until such appeal is finally adjudicated."

---

**20.** In *FW/PBS,* Justice O'Connor, joined by Justices Stevens and Kennedy, reasoned that the *Freedman* requirement that the censor bear the burden of initiating judicial action and the burden of proof in the judicial proceeding should not apply to the licensing scheme of sexually oriented businesses. Justices Brennan, Marshall,

and Blackmun concurred in the judgment, but stated that all three of the *Freedman* procedural safeguards should apply in analyzing the constitutionality of the Dallas licensing scheme. The fragmented opinion of the *FW/PBS* Court leaves the application of the third *Freedman* factor in question.

After reviewing the appeal process for an adverse decision by the zoning administrator, the majority states:

> Thus, when the applicant decides to appeal an adverse zoning administrator decision, the process of licensure is tolled by means of the applicant's decision. To conclude, as the plaintiffs do, that the voluntary choice of an applicant to appeal a zoning classification renders the licensing scheme itself unconstitutional because there is no *specified* time limit for the completion of such appeal process ignores the fact that the time limit specified by the Ordinance for final action by the licensing officer remains intact. The amount of time consumed by the process of judicial review of an adverse zoning administrator determination will also depend in large part on the conduct of the applicant.

Maj. op. at 282.

I disagree with the majority because the Ordinance places unbridled discretion in the zoning administrator and fails to specify a time limit within which a decision on an applicant's appeal must be rendered.

In *FW/PBS*, the Dallas ordinance provided that approval for issuance of a license would be made within thirty days after receipt of an application. *FW/PBS*, 493 U.S. at 227, 110 S.Ct. at 605–06. Prior to issuance of a license, health, fire, and building inspections were required. *Id.* Because the licensing scheme did not place time limits on when the inspections had to occur, the Court stated "the city's regulatory scheme allows indefinite postponement of the issuance of a license." *Id.* The Court concluded:

> Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.

*Id.*

Here, section 8–9–104(D) provides:

> Contemporaneously with the submission of an application for a license, the applicant shall submit the permit from the Zoning Administrator indicating that the requirements of Article 11 of Chapter 14.1 of the City Code are met unless the applicant's sexually oriented business is an existing non-conforming use under the provisions of Article 13 of Chapter 14.1 of the City Code. In the event that such permit is subject to appeal, no further action shall be taken upon such application until such appeal is finally adjudicated.

(Footnote omitted.) Section 14.1–11–103(d) of the Colorado Springs Zoning Ordinance requires the zoning administrator to approve or deny an application for a zoning permit within ten working days after the application is submitted.

The plain language of section 8–9–104(D) is ambiguous as to whether a permit from the zoning administrator is a prerequisite to applying for a license. The first sentence of section 8–9–104(D) states that an applicant must have received a zoning permit before applying for a license. The second sentence implies that an application can be submitted prior to zoning approval, but the application will be held in abeyance until an appeal of the zoning administrator's decision is adjudicated.

If approval from the zoning administrator is a prerequisite to submitting an application, the thirty day period for a decision on the application by the city council will not begin to run until after the application is finally approved by the zoning administrator. Approval by the zoning administrator may be delayed indefinitely because no time limit is specified for the zoning administrator's decision on the appeal.

If an application can be submitted prior to the zoning administrator's approval, the thirty day time period will start to run, but will be tolled during the time that the zoning administrator is considering the applicant's appeal. The ostensibly thirty day time limit may be extended indefinitely because no time limit is specified for the zoning administrator's decision on the appeal.

Although the Ordinance sets specific time limits for a decision on an application for a license, appeal of the zoning administrator's decision may delay the licensing process in-

definitely regardless of whether a zoning permit is a prerequisite to submitting an application. The process delineated in the Ordinance also places unbridled discretion in the zoning administrator to prevent approval of an application.

The majority concludes that the applicant is responsible for any potential delay in the licensing process if the applicant appeals the zoning administrator's decision. Maj. op. at 294. The majority's construction of the Ordinance ignores the presumption against the validity of prior restraints. *See, e.g., FW/ PBS*, 493 U.S. at 225, 110 S.Ct. at 604–05; *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988); *Freedman v. Maryland*, 380 U.S. 51, 57, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965). The applicant's decision to appeal does not remedy the fact that appeal of the zoning administrator's decision may be delayed indefinitely. The majority misconstrues the rationale of *FW/PBS* and the burden of proof imposed on the defendants. The burden should not be placed on the plaintiffs because of their decision to appeal an adverse decision by the zoning administrator, but should properly lie with the defendants because they seek to regulate protected speech.

## B

Section 8–9–105(D) of the Ordinance provides that applicants may appeal the denial of their application by the licensing officer. Sections 8–1–601(B) through –601(D) of the Code provide the procedures for appeal when the application for a license is denied:

B. If the Licensing Officer shall not so find he shall thereupon deny such application and notify the applicant of the denial by serving upon the applicant personally a copy of such denial and the reasons supporting such denial or by mailing the same to him by registered or certified mail at the business address shown on the application.

C. Any applicant aggrieved by any final order of the licensing officer after the denial of such application shall have the right to appeal to the City Council by filing a written appeal, stating the grounds thereof, with the City Clerk within ten (10) days following the date of denial of said application.

D. In the event an appeal is timely filed, it shall be heard at the next regular City Council meeting occurring at least ten (10) days after said filing with the City Clerk. Review by Council shall be a de novo hearing.

Section 8–1–808 of the Code provides:

A. The decision of the City Council in all cases shall be final and conclusive and shall be served upon the licensee by personal service, by registered or certified mail, or by posting as provided in Section 8–1–804 of this Chapter.

B. A decision of the City Council is reviewable only by Court under Colo. R.Civ.P. 106(a)(4). There shall be no stay of execution pending a review by the Court except by Court order.

C.R.C.P. 106(a)(4) provides, in relevant part:

(a) ... In the following cases relief may be obtained in the district court. . . .

. . . .

(4) Where any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law:

(I) Review shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the body or officer.

. . . .

(V) The proceedings before or decision of the body or officer may be stayed, pursuant to Rule 65 of the Colorado Rules of Civil Procedure.

. . . .

(VII) A defendant required to certify a record shall give written notice to all parties, simultaneously with filing, of the date of filing the record with the clerk. The plaintiff shall file, and serve on all parties, an opening brief within forty days after the

date on which the record was filed. If no record is requested by the plaintiff, the plaintiff shall file an opening brief within forty days after the defendant has served its answer upon the plaintiff. The defendant may file and serve an answer brief within thirty days after service of the plaintiff's brief, and the plaintiff may file and serve a reply brief to the defendant's answer brief within fifteen days after service of the answer brief.

(VIII) The court may accelerate or continue any action which, in the discretion of the court, requires acceleration or continuance.

After examining the adequacy of the procedural safeguards provided by the Ordinance and the Code, the majority concludes:

> C.R.C.P. 106 and the Ordinance provide adequate safeguards to ensure that any impermissible prior restraint on a particular applicant's protected rights of free speech may be remedied promptly by judicial intervention.... The provisions of C.R.C.P. 106(a)(4)(VIII) specifically authorize a district court to accelerate or continue any action, and, as indicated, C.R.C.P. 106(a)(4)(V) authorizes a district court to stay any decision to deny, suspend, or revoke a license. These provisions are adequate to withstand the plaintiffs' facial challenge to the Ordinance.

Maj. op. at 284. I disagree because the mechanisms provided by the Ordinance and the Code do not provide the appropriate standard of appellate review and do not constitute prompt judicial review of constitutionally protected speech.

1

C.R.C.P. 106(a)(4) fails to provide the appropriate standard of appellate review required for prior restraints of constitutionally protected speech. Under the explicit language of the Ordinance and the Code, judicial review of city council decisions is limited to the procedures provided in C.R.C.P. 106(a)(4). C.R.C.P. 106(a)(4)(V) and (VIII), which provide for a stay and accelerated review, respectfully, are within the discretion of the district court and are extraordinary remedies. The standard of review under C.R.C.P. 106(a)(4) is limited to an abuse of discretion, and cannot be used as a substitute for prescribed appellate procedures. *See, e.g., Kirbens v. Martinez,* 742 P.2d 330, 333 (Colo.1987) ("Proceedings authorized by C.R.C.P. 106(a)(4) are extraordinary in nature, and accordingly, may not be employed as a substitute for prescribed appellate procedures.") (citations omitted); *People v. Adams County Court,* 793 P.2d 655, 656 (Colo.App.1990) ("Proceedings authorized by C.R.C.P. 106(a)(4) are extraordinary in nature, and the rule cannot be used as a substitute for prescribed appellate procedures.").

In *Redner v. Dean,* 29 F.3d 1495, 1501 n. 9 (11th Cir.1994), the Court of Appeals for the Eleventh Circuit examined the *Freedman* standard for the type of judicial review required for protected speech. The court reviewed cases that have interpreted *Freedman* and stated:

> the Court indicated that the statute, regulation, or ordinance itself must explicitly provide for prompt judicial review of the decision to suppress expressive activity.... The Court thus implied that a state's statutory or common-law mechanisms for review of administrative decisions does not satisfy the procedural requirements of *Freedman.*

*Id.* Other federal cases have stated the appropriate level of judicial review required by *FW/PBS* for a sexually oriented licensing scheme to be constitutional. *See, e.g., TK's Video, Inc. v. Denton County, Tex.,* 24 F.3d 705, 709 (5th Cir.1994) ("*FW/PBS* requires only a prompt judicial hearing, a standard that the order meets by giving an unsuccessful license applicant 30 days to appeal to a district court in Denton County 'on a trial de novo basis.' ") (quoting Denton County licensing order); *Chesapeake B & M, Inc. v. Harford County, Md.,* 831 F.Supp. 1241, 1250 (D.Md.1993) ("In light of *FW/PBS,* the Harford County ordinance is constitutional because it expressly provides for judicial review by the County's circuit court.").

Section 8–1–801 is a Code provision which states that all business and licensing decisions by the Colorado Springs City Council are subject to review under C.R.C.P. 106(a)(4). Judicial review of the denial of a

license for a sexually oriented business is not specifically provided in the Ordinance. Review of administrative decisions under the statutory mechanism in C.R.C.P. 106(a)(4) does not meet the *Freedman* standard for review of protected speech. *See Redner,* 29 F.3d at 1501 n. 9. Because the Ordinance fails to provide for the appropriate level of judicial review in the event a license is denied, the Ordinance is facially unconstitutional.

### 2

In *FW/PBS,* the Court found the Dallas licensing scheme unconstitutional because it failed to provide a time limit within which the licensor's decision had to be made, and it did not provide "an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial." *FW/ PBS,* 493 U.S. at 229, 110 S.Ct. at 606. The Ordinance fails to provide for prompt judicial review when an application for a license is denied. C.R.C.P. 106(a)(4)(VII) permits up to eighty-five days for filing briefs. Because an applicant who has been denied a license will seek to facilitate judicial review, it is unlikely that the applicant will exercise a full forty days to file an opening brief and fifteen days to file a reply brief. However, the city that has denied the license has an incentive to exercise the full thirty days permitted under C.R.C.P. 106(a)(4)(VII) to file an answer brief. A minimum of thirty days and a maximum of eighty-five days is permitted for filing briefs under C.R.C.P. 106(a)(4)(VII).

The Supreme Court has not specifically provided a uniform standard for determining what constitutes prompt judicial review. However, in *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 373, 91 S.Ct. 1400, 1406–07, 28 L.Ed.2d 822 (1971), the Court interpreted a federal statute that imposed a prior restraint to require judicial review to be sought within fourteen days. The Court stated that delays between forty days and six months prior to commencement of proceedings did not constitute prompt judicial review. *Id.* at 371–72, 91 S.Ct. at 1405–06.

The time period under C.R.C.P. 106(a)(4) for the review of protected speech is not prompt judicial review because of the lengthy period for filing briefs, and potential delays and continuances. In addition to the lengthy briefing schedule, an applicant may determine that the procedures outlined in C.R.C.P. 106(a)(4) are too burdensome, which may chill the exercise of protected speech. *See Freedman,* 380 U.S. at 59, 85 S.Ct. at 739.

### 3

The majority concludes that "an application for a license not acted upon by the licensing officer within thirty days of the receipt of the application must be deemed granted." Maj. op. at 281. The Ordinance, however, fails to explicitly provide that an application not acted upon within thirty days will be granted.

In *Wolff v. City of Monticello,* 803 F.Supp. 1568, 1574 (D.Minn.1992), an ordinance regulating sexually oriented businesses did not contain a provision to assure that the status quo was maintained during the time that an application for a license was pending with the city council. The city promised not to enforce the ordinance during the pendency of an action on the constitutionality of the ordinance. *Id.* at 1575. The court determined that because the ordinance did not, on its face, meet the requirements of *FW/PBS* the ordinance was facially unconstitutional. *Id.*

Section 8–9–104(A) of the Ordinance provides that "[i]t shall be unlawful for any person to operate a sexually oriented business without a license issued by the Licensing Officer under the provisions of this Chapter." (Footnote omitted.) The defendants assert that the Ordinance should be construed to require approval of an application if the application is not acted upon within thirty days. However, the Ordinance provides that a person may not operate a sexually oriented business without a license. In the event an application is not acted upon within thirty days, the Ordinance is silent. Because the application process may be postponed indefinitely, the Ordinance is facially unconstitutional.

Accordingly, I would hold the licensing scheme provided in the Ordinance to be fa-

cially unconstitutional and reverse the judgment of the district court.

LOHR, J., joins in this dissent.